UNITED STATES v. HARTFORD ACCIDENT & INDEMNITY CO., and five other cases.

Nos. 5350, 5369–5373.

District Court, D. Maryland.

July 27, 1936.

Bernard J. Flynn, U. S. Atty., of Baltimore, Md. (Geo. W. Whiteside and Abraham Benedict, both of New York City, and James M. Hoffa, of Baltimore, Md., of counsel), for the United States.

Venable, Baetjer & Howard, of Baltimore, Md. (Edwin G. Baetjer, of Baltimore, Md., and Thos. D. Thacher and Sanford H. E. Freund, both of New York City, of counsel), for defendants.

CHESNUT, District Judge.

These six cases present a number of different questions, but there is one which is common to them all. In each case the Government sues the Surety alone (without joining the Principal) on bonds executed by the principal and surety to guarantee compliance with the terms of permits issued by the Government for various stages in the production of industrial alcohol, and a particular product (lacquer thinner) manufactured therefrom. In each of the cases the claim of the Government is that some part of the industrial alcohol dealt in by the principals under the permits and which itself was tax free, was diverted to beverage uses and was therefore properly taxable. The point that is common to all the cases arises on the defendants' contention that the facts alleged in the several declarations (which are all similar) do not show a breach of any of the conditions of the bonds; or more particularly stated, that such diversion of non-taxable industrial alcohol to taxable beverage alcohol, as is alleged in the declarations, occurred not by act of the principal in the bonds to whom the permits were issued, but by acts of third parties after the obligations of the bonds had been fully complied with by the principal with respect to tax-free alcohol.

The facts alleged in these cases by the Government in support of its charge of diversion of alcohol from tax-free to taxable purposes, are quite similar to the claim in that respect made in United States v. U. S. Industrial Alcohol Company, in this court, in which two opinions on the pleadings have been written, one reported in 8 F.Supp. 179, and the other just recently filed 15 F.Supp. 784. In these opinions there was a somewhat extended review of the applicable statutes and judicial decisions. To avoid repetition it will be assumed that the reader hereof has familiarized himself with those two opinions. The cases differ, however, in that in the former case the Government's suit is against the taxpayer individually and directly "as the person responsible" for the taxes, while in the present case the suits are not directly against the alleged taxpayer but against the surety on the bonds. Therefore, in order to properly determine whether there has been a breach of the bonds some further reference in this case should be made to the statutory authority for the particular bonds. But before doing this it will be well to now state just how the question is presented by the pleadings.

In each declaration there are several separate counts. Each count is based upon a separate bond. There are five different forms of bonds but for the purposes of this case they fall into only two different types. One may be described as a "general compliance bond," and the other is the so-called "$2.00 bond." The conditions of the gen-

eral compliance bond are in substance that the principal, who has applied for a permit to deal in industrial alcohol, will comply with all the terms of the permit and with all the applicable laws and regulations affecting liquor and will pay all taxes that may become due and all fines and penalties incurred or imposed. The "$2.00 bonds," however, contain the additional condition · that for all tax-free alcohol diverted to taxable purposes or otherwise unaccounted for, the principal shall pay at the rate of $2.00 per wine gallon, and the bond did not specifically otherwise stipulate for the payment of taxes. In the counts based on this type of bond, the Government seeks to recover the specific $2.00 rate only and treats it as taxes. But in the counts based on the general compliance bonds the Government ·seeks to recover, also as taxes, on some counts at the rate of $6.40 per proof gallon of diverted alcohol and in other counts, the so-called basic tax rate of $1.10 per gallon. In all cases, therefore, it is the Government's contention that what is recoverable under the bonds are unpaid taxes. In contrast therewith the defendants say that what is sought to be recovered in all cases (with the possible exception of the $1.10 rate) are penalties only, and further with reference to the $2.00 rate, it is contended that the penalty was inserted in the bond without statutory authority.

The questions now before the court in these cases are directly presented by the Government's demurrer to the defendants' pleas of limitations. But the common question above referred to is presented to the court under the familiar Maryland rule of pleading that a demurrer at any stage of the case searches the record and mounts to the first error in pleading which in this case is said to lie in the several declarations in that they fail to state a case showing liability on the bond. Here it should be said that when the suits were first filed the defendants promptly interposed demurrers to each of the declarations. After hearing counsel these were respectively overruled, "without prejudice." The principal point urged in support of the demurrers to the declarations at that time (and the only point except as to the counts on the $2.00 bonds)

was that the amounts sued for by the Government were penalties rendered unenforceable by the Twenty-first Amendment. As to the $2.00 bonds, additional grounds of demurrer were assigned, one including the general insufficiency of the declarations, but the point most stressed was the lack of authority for the $2.00 provision in the bond. As the subject matter was both novel and complex, in view of the extended statutory history and Treasury Regulations, and as there was other pending litigation thought possibly to involve similar points, the demurrers were overruled without prejudice, because I did not feel satisfied that the whole subject matter had been exhausted in the arguments then submitted, and the expression "without prejudice" was intended to indicate it was desired to more maturely consider the whole question of legal liability at a later stage of the cases. These further questions, particularly the common point above mentioned, have now been largely discussed by counsel in connection with the demurrers now before the court, the plaintiff's counsel having been notified in advance of the oral argument that the sufficiency of the declarations would again be attacked on the ground indicated. Both sides have submitted extended briefs, the plaintiff submitting four separate briefs consecutively, and the defendants' counsel having submitted three separate briefs. The question as to the effect of the Twenty-first Amendment repealing National Prohibition has, however, not been further re-argued.[1]

Plaintiff's counsel makes the technical point of pleading that, as the defendants have filed general issue pleas, (in general denial of liability) in this case in addition to the special pleas now demurred to, the rule of pleading which otherwise permits a general demurrer to mount to the first error is not applicable. Authorities are cited in support of this from some other state jurisdictions but it is clear that such limitation does not exist in Maryland practice. Gusdorff v. Duncan, 94 Md. 160, 166, 50 A. 574; Parks v. Griffith & Boyd Co., 117 Md. 494, 498, 499, 83 A. 559; Poe on Pleading and Practice, vol. I, § 706, p. 732 (Tiffany's Edition). The point also overlooks the fact

---

[1] For reference to cases dealing more or less directly with this point which had been decided prior to September 1, 1934, see 8 F.Supp. 179, 184. For cases decided since then having general relation to the same or similar subject matter, see United States v. Mack, 295 U.S. 480, 55 S.Ct. 813, 79 L.Ed. 1559; Helvering v. Druggists Specialties Co. (C.C.A.3) 76 F.(2d) 743; United States v. Sendrow (D.C.N.J.) 11 F.Supp. 454; United States v. Friedman, 8 F.Supp. 829, 832 (D.C.E.D.N.Y.).

that the original demurrers to the declarations were overruled without prejudice which meant, of course, that permission was given to revive the contention at a later stage of the cases. And in addition it may be pointed out that it would be a waste of time and expense to permit the parties to prepare for and undergo what is foreshadowed to be a very lengthy trial if the court is convinced that the declarations as drawn are not sufficient to permit recoveries from the defendants of the sums sued for.

■ Before stating just what is charged in the declarations as constituting diversion of tax-free alcohol, it will help to an understanding of the matter if reference is made to the statutory background for the bonds. It is to be borne in mind that for many years prior to, during and subsequent to National Prohibition, there has been a Government tax (the so-called basic tax) on distilled spirits including, of course, ethyl alcohol. For the period here involved (1929–1930) this was at the rate of $1.10 per proof gallon, (approximately $2.00 per wine gallon for the alcohol here involved). This tax was imposed by the Revenue Act of Feb. 26, 1926, c. 27, § 900, 44 Stat. 104, 26 U.S. C.A. § 245 (1926 Ed.) (see 26 U.S.C.A. § 1150 note). For convenience the applicable sections are quoted in the margin.² But also prior to, during and after National Prohibition, Congress, to promote the industrial arts, legislated to make alcohol for industrial purposes, as distinct from beverage purposes, tax free, under regulations, how-

ever, meticulously designed to prevent diversion from one purpose to another, and to protect the revenue, and doubtless also during the era of National Prohibition to discourage violations of law. This policy of Congress with respect to industrial alcohol began as early as 1894.³ A more important act on the subject was the Act of June 7, 1906, c. 3047, 34 Stat. 217, commonly known as the Denatured Alcohol Act. 26 U.S.C. A. (1926 Ed.) §§ 481 and note, 485, 486 (see 26 U.S.C.A. §§ 1320 (a) and note, 1322, 1323). Quite parallel legislation was contained in chapter 3, title 3, of the National Prohibition Act of October 28, 1919 dealing with industrial alcohol. See title 27 U.S.C.A. §§ 71–88. And of course it will be recognized that the Twenty-first Amendment did not repeal chapter 3 of the National Prohibition Act which was not dependent for its constitutional basis upon the Eighteenth Amendment. The general scope of these statutes was to waive the Government's basic tax on distilled spirits (which ordinarily was payable by the distiller upon original withdrawal from the bonded warehouse) when used for industrial purposes and rendered unfit for beverage purposes, but to insure against fraudulent diversion from industrial to beverage purposes, and to avoid loss of revenue on beverage alcohol so diverted, careful regulations were imposed, some by statute and some by Treasury Regulations under statutory authority, for the conduct of the industrial alcohol business. Section 83 of 27 U.S.C.A. is fairly illustrative of the general plan and pur-

---

² "§ 245. Tax on distilled spirits. There shall be levied and collected on all distilled spirits now in bond or that have been or that may be hereafter produced in or imported into the United States, in lieu of the internal-revenue taxes now imposed thereon by law, an internal-revenue tax at the following rates, to be paid by the distiller or importer when withdrawn, and collected under the provisions of existing law.

"(1) Until January 1, 1927, $2.20 on each proof gallon or wine gallon when below proof and a proportionate tax at a like rate on all fractional parts of such proof or wine gallon;

"(2) On and after January 1, 1927, and until January 1, 1928, $1.65 on each proof gallon or wine gallon when below proof and a proportionate tax at a like rate on all fractional parts of such proof or wine gallon; and

"(3) On and after January 1, 1928, $1.-10 on each proof gallon or wine gallon

when below proof and a proportionate tax at a like rate on all fractional parts of such proof or wine gallon.

"(4) On and after February 26, 1926, on all distilled spirits which are diverted to beverage purposes or for use in the manufacture or production of any article used or intended for use as a beverage there shall be levied and collected a tax of $6.40 on each proof gallon or wine gallon when below proof, and a proportionate tax at a like rate on all fractional parts of such proof or wine gallon, to be paid by the person responsible for such diversion. If a tax at the rate of $2.20, $1.65, or $1.10 per proof or wine gallon has been paid upon such distilled spirits a credit of the tax so paid shall be allowed in computing the tax imposed by this paragraph."

³ See Act of Aug. 27, 1894, c. 349, § 61, 28 Stat. 509, 567; Dunlap v. United States, 173 U.S. 65, 76, 77, 19 S.Ct. 319, 43 L.Ed. 616.

pose of the statutes and the character of regulations and supervision provided for: "§ 83. Regulations for establishment, bonding, and operation of industrial-alcohol plants, denaturing plants, and bonded warehouses. The commissioner shall from time to time issue regulations respecting the establishment, bonding, and operation of industrial-alcohol· plants, denaturing plants, and bonded warehouses authorized herein, and the distribution, sale, export, and use of alcohol which may be necessary, advisable, or proper, to secure the revenue, to prevent diversion of the alcohol to illegal uses, and to place the nonbeverage alcohol industry and other industries using such alcohol as a chemical raw material or for other lawful purpose upon the highest possible plane of scientific and commercial efficiency consistent with the interests of the Government, and which shall insure an ample supply of such alcohol and promote its use in scientific research and the development of fuels, dyes, and other lawful products. (Oct. 28, 1919, c. 85, Title III, § 13, 41 Stat. 321.)"

So far as material to this case, it appears that the use of industrial alcohol was as follows: It was first distilled in a distillery, then warehoused, then transferred into a denaturing plant and from there to a manufacturing plant, in which the final product was produced. In regulation of the business permits were required for each of the separate stages in production and separate bonds were required in support of each of the permits. Provision was also made by regulations for very meticulous supervision and inspection by the Government's agents of the whole process from start to finish. It thus resulted that there were several different and successive bonds required from· the operator of a whole industrial alcohol plant where commercial products were final-

ly created. And further provision was made for permits to and bonds to be taken from persons or corporations who did not themselves manufacture denatured alcohol but bought it in its denatured form from a distiller or bonded warehouse to manufacture commercial articles therefrom. They are sometimes referred to as "users." In these instant cases the final commercial product was known as lacquer thinner. The process of creating this was first distillation, second, storage in a bonded warehouse, third, removal to a denaturing plant, and fourth, removal therefrom to a manufacturing plant. Or, in other words, ethyl alcohol was first distilled, then warehoused, then denatured and finally the denatured product manufactured into lacquer thinner, an ordinary commercial product. The so-called two-dollar bonds were required from corporations which did not themselves produce denatured alcohol but bought it under appropriate permits from bonded warehouses. And for a better understanding of the substance of the declaration it may be further explained that denatured alcohol is of two varieties described as "completely denatured alcohol," of which the ordinary anti-freeze mixture for automobile radiators is an illustration, and "specially denatured alcohol" which, when made under different formulas, is suitable for differing commercial products. The Treasury Regulations distinguish between the two in that the use of specially denatured alcohol is more meticulously regulated because it is more easily redistilled, or "cleaned" of the denaturants and again rendered possible (though not advisable) for use for beverage purposes.

A more particular statement with regard to the form and contents of the several bonds involved in this case is, for convenience, appended in the margin.[4]

---

[4] The subject matter has been conveniently and (comparatively) succinctly summarized in one of the briefs of counsel for the defendants as follows:

"*Nature of Bonds sued on.*

"The entire series of processes from the original distillation of spirits or alcohol, to the manufacture of 'lacquer thinner,' set out in the declaration in the present cases, are divided by the Government for purposes· of issuing permits, requiring bonds, etc., into four stages or processes, for each of which a separate form of permit is issued:

"1. For an 'industrial alcohol plant.'· This covers the distillery, where the al-

cohol which is to be subsequently denatured, is distilled or made.

"2. For a 'bonded warehouse,' in which the alcohol or spirits is stored until removed for denaturation.

"3. For a 'denaturing plant,' where the alcohol is mixed with the 'denaturing' additions.

"4. For 'manufacturers' or 'users' of denatured alcohol.

"The use of 'specially denatured alcohol,' after it had been made by the formulas approved by the Department, was allowed only under permits. Ordinary denatured alcohol, such as is sold by gasoline stations, paint stores, etc., was sup-

The applicable Treasury Regulations have been set out fully as an appendix to one of the plaintiff's briefs. The one most particularly in point for this case is Regulations 3, Art. 112, approved Aug. 23, 1927, for "use of specially denatured alcohol for

posed to be so thoroughly rendered impotable and unrefinable by any commercially practicable process, that no restrictions were placed upon its use and sale. Alcohol denatured according to these special formulae, however, was allowed to be used only by licensees under permits. This last form of permit and bond was therefore required of the principal on these bonds because it conducted itself the process of making lacquer thinner, by the addition of other elements, out of the already specially denatured alcohol, instead of, as it might have done, selling the specially denatured alcohol to manufacturers of such products.

"The bonds sued on in the present case comprise bonds given upon permits for each of the four successive steps or processes outlined above. In addition, or rather, in substitution for separate bonds for the three processes first enumerated, what are called 'blanket bonds,' covering in one bond the permits issued for all three steps, were in some cases given, instead of such separate bonds.

"Hence we may classify the bonds sued on as:

"1. Industrial alcohol plant bonds (distillation)

"2. Bonded Warehouse bonds (storage)

"3. Denaturing plant bonds (denaturation)

"4. Blanket bonds, including in one bond all three of the foregoing stages or processes.

"5. Manufacturers' or users' bonds, which we will also call $2.00 bonds, because they provide for the payment of that amount for each wine gallon of denatured alcohol diverted or not accounted for.

"The conditions of these several species of bonds are expressed as follows:

"1. *Industrial Alcohol Plant Bonds.* (Form 1432) If there be no material false statement in the application for such permit and the said principal shall not violate the terms of said permit and shall in all respects faithfully comply with all the provisions of law and regulations relating to the operating of an industrial alcohol plant and shall pay all penalties incurred or fines imposed, and shall not suffer the lot or tract of land on which the industrial alcohol plant stands, or any part thereof, or any of the distilling apparatus to be incumbered by mortgage, judgment or other lien during the time in which he shall carry on said business.

"Permit states that it is issued subject to the following stipulations and conditions, all of which must be faithfully observed, etc.:

"That permittee, etc., will in good faith observe and conform to all the terms and conditions of said permit, with all laws of the U. S. relating to the manufacture, taxation and control of and traffic in intoxicating liquors, all regulations made pursuant to law which are now or may hereafter be in force, and all the liquor laws of the State, etc.

"2. *Bonded Warehouse Bonds.* (Form 1435) If there be no material false statement in the application for such permit and if the said principal shall not violate the terms thereof and shall well and truly pay or cause to be paid the full amount of tax which may be lawfully due or become due on all alcohol stored in the said warehouse before its removal therefrom, and shall pay on demand the tax on all alcohol removed for transportation thereto from any other bonded warehouse and not so transported, received and accounted for in the warehouse of said principal, and if said principal shall keep the said warehouse in good condition for the safe storage of alcohol and shall not remove therefrom any alcohol except under a permit as required by law and regulation and shall keep such records and render such reports, etc., as may be required, and shall pay all penalties imposed or fines incurred for any violation of such permit or of law and regulations.

"Permit similar to above.

"3. *Denaturing Plant Bond.* (Form 1462) If there be no material false statement in the application for such permit and the said principal shall not violate the terms of such permit and shall fully and faithfully comply with all requirements of law and regulations issued pursuant thereto, respecting the transportation, storage, denaturation and removal of such alcohol under lawful permit and shall perform all other acts and render such reports as may be required by said law or regulations, and shall pay on demand all taxes now or hereafter imposed by the laws of the United States on all alcohol so removed from the said bonded warehouses or other denaturing plants and not so transported, denatured or removed under lawful permit, and shall account for such alcohol within the time and in the manner required by said regulations, and if the said principal shall pay all penalties incurred or fines imposed for any violation of such permit or of law and regulations.

manufacturing purposes. Manufacturers bond and application for permit." This and others that have been called to my attention have been examined but they throw no sig-

"Permit similar to above.

"4. *Blanket Bonds.* (Form 1432 A) That if there be no material false statement in the application for such permit or permits or in any modification thereof, and the said principal shall not violate the terms of the permit or permits or any modification or renewal thereof, and shall fully and faithfully comply with all requirements of law and regulations issued pursuant thereto, and shall pay any and all taxes on alcohol now or hereafter imposed by the laws of· the U. S. for which the said principal may be liable, including any such alcohol removed for transportation to and storage or denaturation on the above described premises from a bonded warehouse or denaturing plant established under the provisions of Title III of the National Prohibition Act and not so transported, stored, removed under lawful permit or denatured, by said principal as provided by law or regulations made pursuant to law and lawfully disposed of, and shall account for all alcohol or denatured alcohol produced or received and disposed of within the time and in the manner prescribed by regulations and shall pay all penalties imposed or fines incurred for any violation of said permit or permits, or of law and regulations, and. shall not suffer the lot or tract of land on which the industrial alcohol plant stands, or any part thereof, or any of the distilling apparatus, to be incumbered by mortgage, judgment or other lien, during the time in which he shall carry on such business.

"Permits similar to above.

"5. *Manufacturers' or Users' Bonds.* (Form 1480) That if there be no material false statement in the application for such permit and the principal shall not violate the terms of such permit and shall transport, store and use such denatured alcohol in accordance with the law and regulations made pursuant thereof, and shall in all respects fully and faithfully comply with all provisions of law now or hereafter enacted and all regulations promulgated thereunder respecting such transportation, storage and use and shall pay for all such denatured alcohol illegally or unlawfully diverted, lost or unaccounted for in violation of such permit and law and regulations at the rate of $2.00 per wine gallon, and in addition thereto shall pay all penalties and fines imposed.

"Permit says it is issued subject to the following additional stipulations and conditions, etc., viz.: that permittee, etc., will in good faith observe and conform to all the terms and conditions of said permit; all laws of the U. S. relating to the manufacture, taxation and control of and traffic in intoxicating liquors; all regulations made pursuant to law which are now, or may hereafter be in force; and all the liquor laws of the State in which the permittees' business is located, etc.

"The present suits are brought upon the following species of bonds; and in each count either the $6.40 'diversion tax,' the $1.10 'basic tax,' or the $2.00 wine gallon penalty is specifically alleged as the basis for the recovery sought. In some cases counts specifically claiming the $6.40 diversion tax or penalty are followed by alternative counts claiming basic tax of $1.10 upon the same transactions.

"*No. 5350*, against the Hartford Accident Co., as surety for U. S. Industrial Alcohol and Chemical Companies:

| Count 1 on | Industrial Alcohol Plant | Bond, | claiming $6.40 per gall. |
|---|---|---|---|
| 2 | Bonded Warehouse | " | do |
| 3 | Denaturing Plant | " | do |
| 4 | Denaturing Plant | " | do |

"*No. 5369*, against Royal Indemnity Co., as surety for American Solvents Co., for its plant at Everett, Mass.

| Count 1 on | Blanket Bond, claiming $6.40 per gall. |
|---|---|
| 2 | do 1.10 |
| 3 | do 6.40 |
| 4 | do 1.10 |
| 5 on | Users' bond, do 2.00 per wine gall. |

"*No. 5370*, against Royal Indemnity Co., as surety, for American Solvents Co., for its plant at New Orleans, La.

| Count 1 on | Blanket Bond, claiming $6.40 per gall. |
|---|---|
| 2 | do 1.10 |
| 3 | do 6.40 |
| 4 | do 1.10 |

*No. 5371*, against Royal· Indemnity Co., as surety for American Solvents Co., for its plant at Harvey, La.

| Count 1 on | Blanket Bond, claiming $6.40 per gall. |
|---|---|
| 2 | do 1.10 |
| 3 | do 6.40 |
| 4 | **do** **1.10**" |

nificant light upon the case beyond what is fairly indicated in the statutes themselves, and as already explained. It may importantly be noted, however, *that neither the bond nor the regulations imposed any conditions with regard to the sale or other dealing in the lacquer thinner* mentioned in this case. Article 114 does contain some regulations and restrictions with regard to the sale of some particular products manufactured from specially denatured alcohol, including "rubbing alcohol," "bathing alcohol," bay rum, hair tonics, etc., but not including lacquer thinner. The purpose of all the regulations that have been brought to my attention is to insure that all alcohol withdrawn tax free for industrial purposes shall be actually used in the manufacture and production of commercial alcohol products, and not diverted during the process of manufacture to other purposes. And the essential object of the bond is to secure the Government against loss of revenue by requiring payment for all alcohol so withdrawn tax free and not finally and ultimately accounted for as having gone into the production of commercial non-beverage alcohol products. It was evidently not the purpose of the statutes nor of the regulations pursuant thereto to *project their force and effect beyond the process of manufacture,* or to impose any obligation with respect to the alcohol after it had been completely manufactured and sold and had gone into commercial markets.

The bonds were in different penal or maximum amounts but it is to be noted that in legal character the penalties of the respective bonds did not make them penal bonds in a technical sense but only bonds of indemnity. United States v. Zerbey, 271 U. S. 332, 333, 46 S.Ct. 532, 70 L.Ed. 973. This point, however, is of no great significance in the particular case because the amount of taxes claimed to have been lost by the Government under each of the bonds exceeds the maximum amount of the obligation assumed by the bonds. It may also be noted that the bonds were primarily given to insure compliance with the laws regarding denatured alcohol rather than intoxicating liquor. Campbell v. Long & Co., Inc., 281 U.S. 610, 50 S.Ct. 415, 74 L.Ed. 1070. And bonds of this character, where the form and contents are prescribed by the Government, the obligee, are not to be construed broadly, in favor of the obligee, beyond their express terms and fair import. O'Kane v. Lederer (D.C.) 4 F.(2d) 418, 420; American Surety

Co. v. Pauly, 170 U.S. 133, 140, 18 S.Ct. 552, 42 L.Ed. 977.

With this somewhat necessarily lengthy introduction to the subject, we now come to the allegations of the declarations themselves to ascertain whether they in substance state a case within the coverage of the bonds. Each of the declarations is quite lengthy but the substance of the plaintiff's case in all of them may be taken to be as summarized in one of the Government's briefs reading as follows:

"That the said distilled spirits (ethyl alcohol) used in the manufacture of said lacquer solvent were permitted by the Treasury Department of the Plaintiff to be manufactured by the said Principal * * *, and to be withdrawn from its said Bonded Warehouse * * *, and to be denatured * * *, tax unpaid, on representations by said Principal that they were to be used in the creation, by denaturation, of said Specially Denatured Alcohol. Formula 44-A, which was to be used for lawful tax-free industrial purposes, as provided by Title III of the National Prohibition Act aforesaid; that said representations were false and fraudulent and in violation of the terms of said permits issued to said Principal, and while said distilled spirits (ethyl alcohol) were manufactured and withdrawn from bond and denatured, tax unpaid, by said Principal, ostensibly for lawful industrial uses, in fact, they were manufactured and withdrawn from bond and denatured by said Principal with the design and intent that they were to be used in the creation of Specially Denatured Alcohol, Formula 44-A, that said Specially Denatured Alcohol, Formula 44-A, was then to be used in the manufacture of lacquer solvent as aforesaid, and that said lacquer solvent was then to be sold for the unlawful recovery of the distilled spirits (ethyl alcohol) therein contained, for beverage purposes:

"That said distilled spirits (ethyl alcohol) were so used by the said Principal and thereafter sold by it to said purchasers for the recovery therefrom by said purchasers and other persons of the distilled spirits (ethyl alcohol) therein contained, for beverage purposes:

"That the said lacquer solvent was so used for the recovery of the distilled spirits (ethyl alcohol) therein contained, for beverage purposes."

The question is whether these allegations show a breach of any condition of the bonds.

In the first place it is to be noted that the bonds themselves contain numerous conditions and the declarations do not specify which condition has been breached. But, as what the plaintiff seeks to recover are specific amounts of taxes, it would seem to be inferential that the plaintiff intends to set up as breached that condition of the bond which provides for the payment of taxes (with regard to the $2.00 bonds however the situation is a little different).

In most (or many), of the counts of the declarations what the plaintiff is suing for is a $6.40 per gallon tax rate on alcohol originally withdrawn tax free and subsequently diverted to beverage purposes. The sufficiency of the above quoted allegations of the declaration as showing a breach of the bond, with respect to this claim for the $6.40 tax, must of course be considered with respect to the terms of the statute which imposes the tax and what is claimed in the declaration, and what is not claimed. The tax statute (Revenue Act of 1926, § 900 above referred to) does not impose the tax upon the *act* of diverting untax-paid liquor to taxable purposes, but upon the liquor *after it has been so diverted,* and the person taxable is the one "responsible" for the diversion. The declaration does not allege that the holder of the permit (the principal in the bond) itself diverted any of the industrial alcohol to beverage purposes by redistillation or otherwise; nor do the declarations allege that there was *in fact any diversion of any of the industrial alcohol at any time during the complete process of original withdrawal tax free, and subsequent special denaturation, followed by manufacture therefrom of lacquer thinner.* All that is alleged in this respect is that the lacquer thinner was sold to customers with the principal's "design and intent" that it would be cleaned or redistilled into beverage alcohol. It is not alleged that the sale was made with the *requirement* that this should be done; nor is it alleged that the design was carried out by the immediate purchasers or by any one acting either as partners with or agents for the principal in the bond. Nor is it even alleged that the design and intent was in fact communicated to the purchaser or others.

It is true that the declaration also alleges false and fraudulent representations by the principal to the Government in connection with the withdrawal of the alcohol and its subsequent manufacture into lacquer thinner. But this allegation is very general and not specific. It is not stated which, if any, of the conditions of the bond were violated by such representations. The first condition of the bond is that there shall be no material false statement in the application. The allegation apparently cannot refer to this condition because the application is not set out; nor is there any charge that any statement therein was false. It elsewhere appears however from the plaintiff's briefs that what is meant by this charge of misrepresentation is not really a misrepresentation at all but a concealment; that is, what the plaintiff means to charge is that the principal in manufacturing lacquer thinner had the design and intent to sell it to customers who themselves or others as purchasers therefrom would probably convert the lacquer thinner into beverage alcohol, and that this conversion thereafter was consummated.

Translating the somewhat vague and general formal language of the declaration into a more concrete situation, what I understand the declarations to mean is substantially as follows: The principal in the bond being engaged primarily in manufacturing denatured alcohol and non-beverage commercial products therefrom, to increase the volume of its sales, made sales of lacquer thinner, a perfectly bona fide commercial product, to purchasers thereof who either directly themselves or indirectly through other purchasers, would reconvert the lacquer thinner into beverage alcohol. The principal itself was not interested pecuniarily or in any other way in the profits from this reconversion or resale. Its only interest or profit was on the original sale of lacquer thinner; but the plaintiff seeks to draw the inference from the volume of such sales of lacquer thinner (said to have been beyond the normal requirements of the trade) that the principal was knowingly selling to bootleggers although without partnership or profit in their subsequent activities.

■ The exact question of law is whether this state of facts shows a breach of any condition of the bond. As the purpose of the bond was to guarantee against loss, disappearance or diversion of tax-free alcohol during its process of manufacture into lacquer thinner, it is clear that the plaintiff must show some such loss, disappearance or diversion in order to recover on the bond. Clearly no loss or disappearance in manufacture is alleged. The only remaining possibility is therefore a diversion. Here the

term "diversion" is not limited to the specific meaning of the term as contained in the Taxing Act imposing the $6.40 per gallon tax. It is used in the broader sense of any loss or disappearance or any failure to fully account for all the originally withdrawn tax-free alcohol, during the process of manufacture into lacquer thinner. It is equally apparent that the declarations do not allege, and do not intend to allege, any diversion *in fact,* of any alcohol during the whole manufacturing process. The only diversion in fact which occurred, took place *after* the manufacturing process covered by the permits and bonds had been entirely completed and the lacquer thinner had been sold to purchasers. No condition of the permit or of the bond in terms restricted the persons or classes of persons to whom the lacquer thinner could be sold. It is apparent, therefore, that what the plaintiff is claiming in these cases is not a diversion *in fact* during the operative period of the bond with respect to the manufacture of lacquer thinner but only at most a *constructive* conversion. And this is made plain in the concluding part of one of the plaintiff's briefs where the position of counsel is stated as follows: "It is the Government's theory that it may recover under each of the bonds in suit upon proof that from the time the alleged spirits were manufactured until they were used in the manufacture of solvents alleged to have been sold for the recovery of the spirits thereunder, there was a continuing intent that they should be eventually so used for recovery purposes."

The question then finally comes to this —was such a merely *constructive* conversion a breach of the bonds? No authority has been cited by counsel for the Government in support of such construction of the liability of a surety on a bond of this character. To treat the bond in this way is contrary to the whole point of approach of the law to the obligations of a surety. Obviously a fidelity bond which insured the honesty of a fiduciary in handling money or property during a given period, cannot be said to be breached where no actual conversion takes place by the fiduciary during the life of the bond, even though the fiduciary might have the undisclosed intent to misappropriate some part of the estate after the bond period. The obligations of the surety on a bond of this character relate to the things done or undone by the principal and not to mere present or future intention. The doctrine of a constructive diversion as here contended for by the Government is somewhat analogous to the expansion of the legal concept of trespass as an element in the law of larceny and is far different from the legal approach to measuring the obligations of a surety. The question is not whether the principal, by reason of its design and intent might be held, in connection with other facts and circumstances, to have committed a criminal conspiracy to violate certain statutes of the United States.[5] Nor is the question whether under similar facts and circumstances the principal of these bonds might be personally held liable for the $6.40 per gallon tax on the reconverted alcohol as the "persons responsible" for the diversion.[6] Nor is it the question whether the principal could be held to have been engaged in an attempt to evade taxes and subject to appropriate discipline therefor. See Various Items of Personal Property v. U. S., 282 U.S. 577, 51 S.Ct. 282, 75 L.Ed. 558. On the contrary the question here is whether the facts alleged in the declarations make out a case of breach of any condition of the particular bonds.

Not only must the declarations show some particular condition of each bond to have been breached, but also that the particular damage demanded is recoverable as a result of the breach. As to the claims for the $6.40 tax rate, it is difficult to perceive how any or all of the facts alleged, treating them in their most favorable import for the plaintiff, could justify a recovery thereof. This tax rate became payable only after a consummated actual diversion of the alcohol to beverage purposes. The bond had ceased to cover the particular alcohol at that time. The doctrine of a constructive conversion is clearly not applicable to such a situation.

The case as to the $1.10 basic tax rate claimed under some counts on the general compliance bonds and for the $2.00 rate on the users' bonds, is perhaps somewhat different. While the plaintiff has alleged in substance only one set of facts as a basis for the several contentions, it seems to be

---

[5] As a matter of fact it appears from United States v. U. S. Industrial Alcohol Co., above referred to and from United States v. Glidden Co., Inc., 78 F.(2d) 639 (C.C.A.6) that certain defendants have been indicted and fined in this court for a conspiracy of this nature.

[6] See United States v. U. S. Industrial Alcohol Co., supra.

the argument that, as to these two rates, the alcohol was diverted on its original withdrawal, by reason of the existing fraudulent intent of ultimate misapplication, and therefore the tax became immediately payable. This possible view as to liability of the surety on these bonds has not been fully discussed by counsel, and is not clearly and definitely presented by the declarations in their present form. It is possible that appropriate amendments may clearly raise the issue. Until that is done, it is not necessary to decide the question. In their present form the counts claiming the $1.10 rate are defective because indefinite, vague and uncertain as to the particular subject matter. There is no clear and specific statement as to just what misrepresentations were made by the principal in withdrawing the alcohol tax free; nor do the counts clearly allege which bonds are liable for particular quantities of alcohol so fraudulently withdrawn.

If the theory of constructive diversion is to be pressed, it is important that the declarations should be redrawn to clearly present the issue under appropriate definite allegations, and thus clearly define and limit the issue to be tried.

█ The declarations in their present form include to a greatly unnecessary extent matter which is purely evidentiary; specifying in great detail quantities of alcohol on hand in certain plants at certain times and quantities transferred to other plants, and retransfers during manufacture with subtractions and additions, in all leaving a rather confused impression as to the ultimate final result, with respect to the *only important question of how many gallons of denatured alcohol were diverted to beverage purposes.* Furthermore only one and the same set of facts is set out for the purpose of showing a breach of the several bonds, apparently without appropriate segregation of the amount of diverted alcohol for which the respective bonds were severally liable. It is apparently in connection with this situation that one of the Government's briefs says: "At the trial the Government will undertake to earmark the spirits in such a way that the jury may find that a certain portion thereof was diverted under the Industrial Alcohol Plant bond; the second portion under the Warehouse Bond; the third portion under the Denaturing Plant Bond, and the fourth portion under the bond covering the use of specially denatured alcohol for manufacturing purposes. The jury, of course, would be instructed that up-

on a finding that a particular gallon of alcohol was diverted at a particular point, for example, when leaving the warehouse, they should eliminate that particular gallon from further consideration of liability under the other bonds covering other steps of the alleged diversions. In Cases Nos. 5369, 70, 71, however, a single bond in each case covered the Industrial Alcohol Plant, Bonded Warehouse and Denaturing Plants."

Certainly the declarations in all the cases could be much bettered as to form by greater brevity and simplicity of statement and absence of evidentiary detail. All that good pleading requires in a case of this character is allegations as to the execution and substantial contents of the bonds sued on, a specification as to what particular condition thereof is claimed to have been breached, and a simple short statement of the ultimate facts which are set up as constituting the breach, together with a claim for the appropriate amount recoverable by reason of the particular breach alleged.

For these reasons I hold that the several declarations and each of the counts thereof as at present drawn are legally insufficient to justify the respective recoveries demanded. But it should be said that in cases Nos. 5372 and 5373 the counts are not subject to all the criticisms above mentioned. Their principal defect is the failure to clearly and definitely present the point as to constructive diversion on original withdrawal of the alcohol tax free for industrial purposes. In them claim is made only for the $2.00 rate per wine gallon. But leave is given to amend the declarations.

As the holding is that the declarations are legally insufficient, it is perhaps unnecessary to rule at this time on the sufficiency of the pleas which have been specifically demurred to. But, as the questions have been very fully argued by counsel and as it is probable the cases will proceed further, it may be useful at this time to express the views entertained upon this subject, after study thereof.

█ The separate pleas set up the federal statutes of limitations applicable respectively to the collection of penalties and taxes. The former is to be found in 28 U.S.C.A. § 791, and the latter in old section 105, new section 1432 (a) and note, title 26 U.S.C.A. (Revenue Act 1926, § 1109 (a) (1), 44 Stat. 114). Five years is the period. Obviously the defense is applicable to only a comparatively small portion of the whole amount claimed by the plaintiff, but under the Mary-

land rule of pleading it was necessary to promptly file a plea of limitations otherwise the defense would have been waived.

The ground of demurrer assigned by the plaintiff as to the insufficiency of the pleas is, as to the penalties, that what is sued for is *taxes* and *not penalties;* and, as to the pleas of limitations regarding taxes, that old section 106, new section 1432 (b, c) and note, of title 26 U.S.C.A. (Revenue Act 1926, § 1109 (a) (2), 44 Stat. 114) applies. These latter sections provide that there shall be no period of limitations in proceedings to collect taxes where there has been a false or fraudulent return with intent to evade the tax or the failure to file a return within the time required by law, by the taxpayer, or a willful attempt to defeat or evade the tax. And the plaintiff says that the declarations set up a case showing such fraud by the principal. As to the latter point the defendants say that the pleas of limitations as to the taxes were filed on the assumption that it was not necessary for them to negative such fraud in the pleas and that they anticipated the point would be made by the plaintiff by replication. However, insistence is not made upon that stand as the pleas can be readily amended to deny the fraud or tax evasion. But with respect to the limitations as to collection of penalties, the defendants stoutly insist that, with the exception of the $1.10 basic tax rate contended for in the alternative in some of the counts, the other recoveries sought by the plaintiff are penalties alone.

■■■ On this question as to whether what is sought by the plaintiff is taxes or penalties, I will briefly summarize my conclusions. As to those counts which seek to recover the $6.40 per gallon tax, it must be held, for the reasons given in the opinion just filed in the case of United States v. U. S. Industrial Alcohol Company, supra, that what is sought to be recovered is a penalty. But with regard to the counts based on the theory that the damages recoverable under the bonds are at the rate of $1.10 per gallon, the so-called basic tax, the suit is essentially to recover taxes, or damages measured by the amount of what would have been such taxes, and not a penalty. And this I understand is not really disputed by the defendants.

■■■ The remaining question in this category is what is the character of the recovery sought under the so-called $2.00 bonds. In the case of United States v.

Kern, 8 F.Supp. 296, 300, it was held in the District Court of the United States for the Eastern District of New York, in a similar suit, the recovery sought (in that case $4.50 per wine gallon) was a penalty and not a tax and therefore title 28 U.S.C.A. § 791, was applicable. The question is by no means free from difficulty, but after careful consideration of the regulations which have been called to my attention and which are set out in detail in the plaintiff's brief, regarding the historical development of this form of bond, it is not at all clear to me that the provision in the bond for payment at the rate of $2.00 per wine gallon for industrial alcohol withdrawn tax free but diverted to beverage purposes or otherwise unaccounted for, should be regarded as a penalty. The history referred to would seem to indicate quite clearly that the $2.00 rate per wine gallon was fixed upon as approximately the amount of the basic tax rate of $1.10 per proof gallon of alcohol which would be properly payable as the basic tax rate on distilled spirits upon original withdrawal from the warehouse. As the bonds are to be classed as indemnity bonds, it appears to me that a real effort was made to approximate the amount of the tax; and not to impose a penalty. In this respect the case seems to fall within the principle applied in United States v. Frost in the opinion of Circuit Judge Hutcheson of the Circuit Court of Appeals for the 5th Circuit, 80 F.(2d) 341. The defendants also attack this provision in these bonds on the ground that the $2.00 rate was inserted by the Commissioner without statutory authority. I am not able to say, however, that this stipulation of the bond was without statutory authority. It is true it is not specifically mentioned in the statute, but would seem to fall within reasonable regulations which are themselves authorized by statute. The provision is more analogous to a tax than to a penalty. But however that may be, it is an expressed contractual provision of the bond which was voluntarily given by the principal and surety without unlawful compulsion. I see no valid reason for non-compliance with their contractual obligations if the bond has in fact and in law been actually breached.

■■■ There is, however, another consideration which has led me to conclude that the plaintiff's demurrers to these pleas are sustainable on a different ground than that assigned in the demurrers. The suits are on bonds as independent contractual obligations and are not directly at least prose-

cutions for the collection of taxes or penalties. The language of title 28 U.S.C.A. § 791, is as follows: "No suit or prosecution for any penalty or forfeiture, pecuniary or otherwise, accruing under the laws of the United States, shall be maintained," etc. In United States v. U. S. F. & G. Co., 221 F. 27, 29,[7] it was held by the Circuit Court of Appeals for this Circuit (and of course is binding authority here) that a suit on a bond of this character (there a distiller's bond) was not barred by the period of limitations in this statute. It was there said by Circuit Judge Knapp: "In the first place, we are of the opinion that the action is not barred by any statute of limitations. The defendant cites and apparently relies upon section 1047 of the Revised Statutes (Comp.St.1913, § 1712) [now title 28 U.S.C.A. § 791]. * * * But this suit is brought upon the bond of a surety, and not to recover a statutory penalty or forfeiture, and it seems clear to us that the section quoted has no application."

A similar view was taken as applicable to a permittee bond (like those in this case) by the District Court of New Jersey in United States v. Sendrow, 11 F.Supp. 454; and the same principle was applied in a suit on a bond of slightly different character in United States v. Frost (C.C.A.) 80 F.(2d) 341, supra. United States v. Theurer, 213 F. 964 (C.C.A.5), certiorari denied 235 U.S. 706, 708, 35 S.Ct. 283, 59 L.Ed. 434, and United States v. Joles, 251 F. 417 (D.C. Mass.) are seemingly contrary in principle. On this point the defendants rely chiefly on United States v. Springer and Lotz, 69 F.(2d) 819 (C.C.A.2) where the Court, in an interesting opinion by Circuit Judge Learned Hand, approves the above case in this Circuit in principle, but distinguishes it from the then instant case on the particular construction of the conditions of the bond there sued on, the language of which was that the "principal shall pay * * * penalties payable" by him "and all other lawful debts * * * owing to the United States." The view taken was that a penalty no longer collectible by virtue of statutory limitations did not continue to remain. *payable;* and as the nature of the bond was ancillary and not primary, it would be quite unreasonable to construe the condition as imposing an obligation on the bond which had been extinguished by the statute as to the principal. Persuasive as the reasoning

is in many respects [compare however United States v. Frost (C.C.A.) 80 F.(2d) 343, supra], I do not feel at liberty to apply it here in view of the very clear decision in this Circuit, especially as the conditions of the bonds involved here do not contain the same phraseology as that in the Springer & Lotz Case, particularly in the absence here of the word "payable" on which the reasoning of that decision seems to have. been largely based.

Counsel may submit the appropriate orders to be entered in all the cases in accordance with this opinion. As already stated, leave is granted to the plaintiff to amend the declarations in all the cases if that is desired.

---

[7] Cited with approval in United States v. John Barth Co., 279 U.S. 370, 376, 49 S.Ct. 366, 73 L.Ed. 743.