UNITED STATES v. VAN SCHAACK BROS. CHEMICAL WORKS, Inc., et al.

No. 43062.

District Court, N. D. Illinois, E. D.

April 24, 1940.

Petition for Rehearing Denied July 31, 1940.

824

Wm. J. Campbell, Dist. Atty., of Chicago, Ill., Samuel O. Clark, Jr., Asst. Atty. Gen., and Andrew D. Sharpe, Frederick G. Rita, and Paul Mickey, Special Assistants to the Atty. General, all of Washington, D. C., for the United States.

Collins, McKenna & McCullough, of Chicago, Ill., for defendant.

HOLLY, District Judge.

The defendant, Van Schaack Bros. Chemical Works, Inc., as principal, and the defendants, United States Guarantee Company, as surety, on April 21, 1927, made, executed and delivered to plaintiff a bond in the penal sum of $100,000. The obligation of the bond was as follows:

"Whereas, the above-bounden Principal has made application for the issuance of a permit to use specially denatured alcohol, under regulations issued pursuant to Title III of the National Prohibition Act, in the manufacture of articles enumerated in the application (Form 1479) submitted herewith, or in any such applications subsequently filed, and for which specific approval has been given, the said alcohol so denatured to be obtained from denaturing plants or bonded dealers' storerooms established under law and regulations made pursuant thereto.

"Now, therefore, the condition of this obligation is such that if there be no material false statement in the application for such permit, and the said principal shall not violate the terms of such permit, and shall transport, store and use such denatured alcohol in accordance with the law and regulations made pursuant thereto, and

shall in all respects fully and faithfully comply with all provisions of law now or hereafter enacted and all regulations promulgated thereunder respecting such transportation, storage and use, and shall pay for all such denatured alcohol illegally or unlawfully diverted, lost, or unaccounted for in violation of such permit and law and regulations at the rate of $4.50 per wine gallon, and in addition thereto shall pay all penalties and fines imposed, then this obligation to be void; otherwise to remain in full force and virtue."

Several permits were issued during the ensuing years. The two pertinent to this suit dated March 25, 1929, and December 2, 1929, respectively, were both expressly conditioned upon the observance by the Van Schaack Bros. Chemical Works, Inc., of "all the laws of the United States relating to the manufacture, taxation, and control of, and traffic in, intoxicating liquors, (and) all regulations made pursuant to laws which are now, or may hereafter be in force." The one which became effective on December 2, 1929, further provided:

"8. That the sale of thinners, solvents and ethyl acetate manufactured under this permit is restricted to only those corporations, firms, or individuals which use these products for their own manufacturing purposes, and only in quantities according to their own requirements and not in any event for resale as such.

"In the event of sales of thinners, solvents or ethyl acetate by the permittee to jobbers, wholesalers, or dealers the permittee guarantees to assume all responsibility for all sales by the jobbers, wholesalers, or dealers."

In count I of its amended complaint filed herein on May 4, 1936, the United States alleges in substance that during the period commencing September 30, 1929, and ending June 30, 1930, the defendant, Van Schaack Bros. Chemical Works, Inc., purchased 727,977.5 wine gallons of specially denatured alcohol, Formula 2–3; that of this amount 697,141.5 wine gallons were employed in the manufacture of ethyl acetate; that the said specially denatured alcohol had been produced for industrial use in compliance with Title III of the National Prohibition Act, 27 U.S.C.A. § 71 et seq., and regulations promulgated thereunder; that this statute exempted distilled spirits applied to legitimate industrial purposes and rendered unfit for consumption as a beverage from the basic tax of $1.10 per proof gallon imposed by Revenue Act 1926, § 900(3), 26 U.S.C.A.Int. Rev.Acts; that between October 10, 1929, and June 16, 1930, the defendant Van Schaack Bros. Chemical Works, Inc., sold to various concerns a total of 2,973,763.9 pounds of ethyl acetate, the manufacture of which required 249,336.6 wine gallons of specially denatured alcohol, Formula 2–B containing 467,619.7 proof gallons of distilled spirits on which no tax had been paid; that the plaintiff had been induced to permit the defendant Van Schaack Bros. Chemical Works, Inc., to acquire the said specially denatured alcohol by the false representation that it was to be employed only for legitimate industrial purposes; that the fact was that the defendant, Van Schaack Bros. Chemical Works, Inc., manufactured and sold the said 2,973,763.9 pounds of ethyl acetate with the "design, knowledge and intent" that the purchasers thereof, "and other persons" would recover the distilled spirits therein contained for beverage purposes; that, in other words, the production and sale of ethyl acetate was a step in a fraudulent scheme for the diversion of distilled spirits in the said 249,336.6 wine gallons of specially denatured alcohol, Formula 2–B to beverage uses and for the evasion of the aforesaid basic tax; that the latter was imposed upon the distiller or importer but, as pointed out above, was waived in the case of industrial alcohol; that by reason of the fraudulent conduct of the defendant, Van Schaack Bros. Chemical Works, Inc., the plaintiff lost and was deprived of the revenue to which it was entitled on 467,619.7 proof gallons of distilled spirits at the rate of $1.10 per proof gallon, or a total of $514,381.67; that the defendants became indebted in damages to the plaintiff in that amount; that, however, recovery must be limited to the maximum penal sum of the land which is $100,000.

The second and last count reiterates the same facts but presents an entirely different theory of damages. One of the conditions of the bond was that the principal "pay for all such denatured alcohol illegally or unlawfully diverted, lost or unaccounted for in violation of such permit and law and regulations at the rate of $4.50 per wine gallon * * *". Under this clause the plaintiff claims the defendants to be obligated to it as follows: "249,336.6 wine gallons specially denatured alcohol, Formula 2–B, diverted to beverage

uses at $4.50 per wine gallon ($1,122,014.70 but limited to the amount of the bond) $100,000." Seventeen alleged defenses are advanced in the answer of the defendants. Their subsequent amended answer raises several additional questions of fact and attempts to impugn the legal validity of that portion of the permit issued on December 2, 1929, which is quoted above. A motion to strike filed by the plaintiff on January 6, 1939, seeks the elimination of section 8 of paragraph I, paragraphs II to XIV, inclusive, section 3 of paragraph X, and paragraphs XVI and XVII of the answer. The scope of this opinion is restricted to the disposition of this last pleading.

Counsel for the defendants have condensed their numerous contentions into the following eight points:

"1. The bond does not cover the payment of taxes.

"2. The use by the permittee of all specially denatured alcohol withdrawn by it under its permit in the manufacture of ethyl acetate, the product authorized by the permit, is in full compliance with the bond and permit.

"3. Neither the bond nor the permit covers sales of ethyl acetate.

"4. No taxes could be assessed against permittee for alleged diversion to beverage purposes under the statute mentioned in the amended complaint.

"5. No assessment of taxes was made against permittee within four years, and the amended complaint filed May 4, 1936, seeking to recover loss of taxes was filed more than four years after the alleged taxes became due and payable, and the action is therefore barred by the statute of limitations.

"6. The amended complaint, in so far as it seeks to recover penalties, is barred and unenforceable by reason of the repeal of the Eighteenth Amendment to the Constitution.

"7. The claim for so-called taxes and the $4.50 unit rate are all penalties asserted under authority of the Eighteenth Amendment to the Constitution.

"8. The inclusion of paragraph 8 in the permit (dated December 2, 1929) was without legal authority and not binding upon either of the defendants."

These defenses will be considered in the order enumerated, but the second and third will be treated as one.

First. To understand the legal effect of the bond here in question, it is necessary to delve somewhat into the statutory background. Until 1894 distilled spirits destined for industrial processing were subject to the same basic tax as those intended for consumption as a beverage. In that year, however, Congress for the first time provided for a rebate of the tax to any "manufacturer finding it necessary to use alcohol in the arts, or in any medicinal or other like compound." Act of Aug. 27, 1894, C. 349, sec. 61, 28 Stat. 509, 567. This legislation was repealed in 1896. After a lapse of ten years, Congress enacted a much more important and comprehensive statute known as the Denatured Alcohol Act, 34 Stat. 217, 26 U.S.C.A.Int.Rev.Code §§ 3070, 3072, 3073. This authorized the withdrawal of alcohol for industrial purposes from bonded ware houses without the payment of the basic tax, and empowered the Commissioner of Internal Revenue to prescribe such regulations as he deemed expedient and essential to prevent fraudulent diversion of distilled spirits to beverage uses and a consequent loss of revenue. As a means to that end, persons withdrawing alcohol tax-free under this Act were required to keep such records and post such bonds as the Commissioner, with the approval of the Secretary of the Treasury, might direct.

The substance of this plan of control was incorporated in Title III of the National Prohibition Act of October 28, 1919, 27 U. S.C.A. § 71 et seq. Section 83 of 27 U.S. C.A. provided that: "The commissioner shall from time to time issue regulations respecting the establishment, bonding and operation of industrial-alcohol plants, denaturing plants, and bonded warehouses authorized herein, and the distribution, sale, export, and use of alcohol which may be necessary, advisable, or proper, to secure the revenue, to prevent diversion of the alcohol to illegal uses, and to place the nonbeverage alcohol industry and other industries using such alcohol as a chemical raw material or for other lawful purpose upon the highest possible plane of scientific and commercial efficiency consistent with the interests of the Government, and which shall insure an ample supply of such alcohol and promote its use in scientific research and the developments of fuels, dyes, and other lawful products."

Among the administrative orders promulgated by the Commissioner in pursuance

to the authority conferred upon him by the Denatured Alcohol Act was Article 78 of Regulations No. 30—Revised, which was approved by the Secretary of the Treasury on October 12, 1917. This directed the manufacturer withdrawing alcohol for industrial use to file "a bond in duplicate, with sureties satisfactory to the collector and in a penal sum sufficient to cover the tax on all alcohol that may be, at any time, on hand, in transit or unaccounted for, and in no case less that $500. The bond for specially denatured alcohol will be executed on Form 582 or 582A * * *". After the passage of the National Prohibition Act the Commissioner on January 21, 1920, issued Article 114 of Regulations 61, which read in part as follows:

"The collector, if satisfied that a permit shall be issued, will endorse his approval on the application, and forward the same to the Commissioner of Internal Revenue, together with the bond of the manufacturer, which bond must be executed in duplicate with sureties satisfactory to the Collector, on Form 1480.

"The penal sum of the bond shall in no case be less than $500, or more than $100,-000 and shall be graduated, in accordance with the quantity of alcohol at any time on hand, in transit, or unaccounted for.

* * *

"Existing bonds, Forms 582 A, may be continued where the penal sum is sufficient to cover the estimated quantity, and all new bonds will be executed on Form 1480."

The bond upon which the instant suit is founded followed Form 1480. Under Form 582 A the obligor covenanted and agreed "in case said denatured alcohol * * * is diverted from the purpose for which it is intended to pay * * * to the collector * * * the amount of tax on the whole amount of alcohol so wrongfully diverted or used." (Italics mine.) All reference to the tax was omitted from Form 1480. In lieu thereof provision was made for the payment by the obligor to the obligee of the flat sum of $4.50 for each wine gallon of denatured alcohol "illegally or unlawfully diverted, lost or unaccounted for * * *". This new method of computing the amount accruing to the United States upon a misapplication of denatured alcohol was apparently not regarded by the Commissioner as a radical departure from precedent, for, under the last paragraph quoted above of Article 114 of Regu-

lations 61, he permitted all existing bonds which had been executed on Form 582 A and which were in a sufficient penal amount to continue in effect. In other words Form 1480 was not intended as an innovation but as an improved successor to Form 582A whose primary object it was to insure the Government against loss of revenue resulting from the wrongful diversion or use of denatured alcohol.

Indeed, the unit penal sum fixed by Form 1480 was not an arbitrary figure, chosen at random, but was originally a reasonable approximation of the basic tax which prevailed between 1919 and 1926 amounting to $2.20 per proof gallon. A wine gallon being equivalent to about 1.9 or 2 proof gallons, depending upon the proof of the alcohol used, the tax thereon, allowing for interests and costs, would easily consume all or the greater part of said sum of $4.50. On January 1, 1927, the basic tax was lowered to $1.65 per proof gallon, but, since this new rate was to be operative only until December 21, 1927, when it was to be further reduced to $1.10 per proof gallon, no change was made in Form 1480 for several months. Hence defendant's bond, though executed on April 21, 1927, provided for payment of $4.50 per wine gallon. A new unit penal sum of $2.00 was finally ordered on October 1, 1927, but the bonds previously accepted, including that of the defendants, were not recalled or rescinded until replaced by new bonds. The defendants did not see fit to make a substitution.

That the primary purpose of Forms 582 A and 1480 was to indemnify the Government against possible evasion of the basic tax is clearly recognized by all the decisions on the subject. Although United States v. Hartford Accident & Indemnity Co., D.C.Md.1936, 15 F.Supp. 791, 799, expresses certain opinions in which I cannot concur, it contains one of the most lucid expositions of this view. The court there said that: "The purpose of all the regulations that have been brought to my attention is to insure that all alcohol withdrawn tax free for industrial purposes shall be actually used in the manufacture and production of commercial alcohol products, and not diverted during the process of manufacture to other purposes. And the essential object of the bond is to secure the Government against loss of revenue by requiring payment for all alcohol so withdrawn tax free and not finally and

ultimately accounted for as having gone into the production of commercial non-beverage alcohol products." Whether Form 1480 does in fact indemnify the Government against evasion of the basic tax, and if so, how and to what extent, will be considered below.

Second. The defendants assert that the obligation of their bond covered only the period intervening between the receipt of specially denatured alcohol and the manufacture of ethyl acetate, that upon the completion of the finished product the force of the bond was spent, and that subsequent sales of ethyl acetate were free from restriction, regulation, or supervision by the Government. One of the strongest authorities in support of this position is Judge Chesnut's opinion in United States v. Hartford Accident & Indemnity Co., supra. The Government in that case sued on several bonds some of which provided for general compliance with all laws and regulations relating to denatured alcohol, and the rest of which followed from 1480 and stipulated for the payment of a unit penal sum of $2. So far as the bonds of the last type were concerned, recovery was requested at the rate specified. The theory with respect to the general compliance bonds was that the Government was entitled either (1) to the basic tax of $1.10 per proof gallon or (2) to the diversion tax of $6.40 per proof gallon imposed by Revenue Act 1926, § 900(4), 26 U.S.C.A. Int.Rev.Acts, which stated that: "On and after [the enactment of the Revenue Act of 1926] February 26, 1926, on all distilled spirits which are diverted to beverage purposes or for use in the manufacture or production of any article used or intended for use as a beverage there shall be levied and collected a tax of $6.40 on each proof gallon or wine gallon when below proof, and a proportionate tax at a like rate on all fractional parts of such proof or wine gallon, to be paid by the person responsible for such diversion. If a tax at the rate of $2.20, $1.65, or $1.10 per proof or wine gallon has been paid upon such distilled spirits a credit of the tax so paid shall be allowed in computing the tax imposed by this paragraph." In Various Items of Personal Property v. United States, 1931, 282 U.S. 577, 51 S.Ct. 282, 75 L.Ed. 558, it had been held that this diversion of tax of $6.40 was comprised in part of the basic tax of $1.10 which was a true tax and that the difference between these two figures was a penalty.

After reviewing the various statutes and regulations summarized above, Judge Chesnut declared that they were not intended *"to project their force and effect beyond the process of manufacture,* or to impose any obligation with respect to the alcohol after it had been completely manufactured and sold and had gone into commercial markets." Turning specifically to the consideration of the bonds before him, he said:

"Clearly no loss or disappearance in manufacture is alleged. The only remaining possibility is therefore a diversion. Here the term 'diversion' is not limited to the specific meaning of the term as contained in the Taxing Act imposing the $6.40 per gallon tax. It is used in the broader sense of any loss or disappearance or any failure to fully account for all the originally withdrawn tax-free alcohol, during the process of manufacture into lacquer thinner. It is equally apparent that the declarations do not allege, and do not intend to allege, any diversion *in fact,* of any alcohol during the whole manufacturing process. The only diversion in fact which occurred, took place after the manufacturing process covered by the permits and bonds had been entirely completed and the lacquer thinner had been sold to purchasers. No condition of the permit or of the bond in terms restricted the persons or classes of persons to whom the lacquer thinner could be sold. It is apparent, therefore, that what the plaintiff is claiming in these cases is not a diversion *in fact* during the operative period of the bond with respect to the manufacture of lacquer thinner but only at most a constructive conversion. * * *

"The question then finally comes to this—was such a merely constructive conversion a breach of the bonds? No authority has been cited by counsel for the Government in support of such construction of the liability of a surety on a bond of this character. To treat the bond in this way is contrary to the whole point of approach of the law to the obligations of a surety. * * *

"Not only must the declarations show some particular condition of each bond to have been breached, but also that the particular damage demanded is recoverable as a result of the breach. As to the claims for the $6.40 tax rate, it is difficult to per-

ceive how any or all of the facts alleged, treating them in their most favorable import for the plaintiff, could justify a recovery thereof. This tax rate became payable only after a consummated actual diversion of the alcohol to beverage purposes. The bond had ceased to cover the particular alcohol at that time. The doctrine of a constructive conversion is clearly not applicable to such a situation."

Having made these observations, the learned Judge proceeded to contradict and refute his own chain of logic to some extent by adding that the "case as to the $1.10 basic tax rate claimed under some counts on the general compliance bonds and for the $2.00 rate on the users' bonds, is perhaps somewhat different. While the plaintiff has alleged in substance only one set of facts as a basis for the several contentions, it seems to be the argument that, as to these two rates, the alcohol was diverted on its original withdrawal, by reason of the existing fraudulent intent of ultimate misapplication, and therefore the tax became immediately payable. This possible view as to liability of the surety on these bonds has not been fully discussed by counsel, and it is not clearly and definitely presented by the declarations in their present form. It is possible that appropriate amendments may clearly raise the issue. Until that is done, it is not necessary to decide the question." Now, at this point, it should be emphasized that the instant suit is not for the $6.40 diversion tax but for either the basic tax of $1.10 or for damages predicated upon the aforesaid $4.50 unit penal sum provided for in the bond.

Judge Chesnut's views on diversion can accordingly have little bearing upon the facts before this court. Moreover, his conclusions, even if confined to the $6.40 tax, are in sharp conflict with the superior authority of Various Items of Personal Property v. United States, supra. The Supreme Court there said that [282 U.S. 577, 51 S.Ct. 283, 75 L.Ed. 558]: "The alleged diversion was accomplished by the withdrawal of pure alcohol, which was then specially denatured and made unfit to drink, and in that condition was sold. Petioners contend that this was a diversion not of distilled spirits, but of denatured alcohol, and, therefore, not within the reach of section 600(a). But upon the evidence and the instructions of the court it was open to the jury to find that the alcohol was specially denatured to the contemplated end that, after it had passed into the hands of purchasers, it would be 'cleaned' and finally used for beverage purposes. In that view it is entirely accurate to say that the alcohol was diverted to beverage purposes, the special denaturing being only an intervening step." This decision was applied in United States v. Bornn, 2 Cir., 104 F.2d 641, 645, to several Form 1480 bonds. Among other things, the court observed that: "The defendants say that there was no diversion of the specially denatured alcohol, that Bornn's misconduct had to do only with rubbing alcohol and that rubbing alcohol was not covered in the bonds; hence there was no breach of the condition in the bonds. United States v. Hartford Accident & Indemnity Co., 15 F.Supp. 791, D.C., is an authority in support of the argument. We find it unconvincing. With the finding that Bornn obtained the specially denatured alcohol to the end that it might be passed on to purchasers in the form of rubbing alcohol and then cleaned of denaturants and other ingredients and used for beverage purposes, it is accurate to say that the specially denatured alcohol was diverted to beverage purposes, the rubbing alcohol being only an intervening step."

This holding appears to me sound and directly pertinent to the issues raised by the instant case. If the defendant, Van Schaack Bros. Chemical Works, Inc., engaged in the manufacture of ethyl acetate merely as a subterfuge designed to supply certain persons with distilled spirits for conversion into beverage form free of the basic tax, then an illegal diversion within the meaning of the bond did occur. The interposition of a perfectly legitimate enterprise such as the production of ethyl acetate will not serve to obscure or obviate the ultimate intent to misapply denatured alcohol.

Third. Defendants further maintain that the basic tax was payable only by the distiller and could not lawfully be assessed against the Van Schaack Bros. Chemical Works, Inc. This argument has its origin in an analysis of the various steps through which industrial alcohol must pass before its actual use in manufacturing. These normally consist of (1) the production of distilled spirits in a distillery, (2) their storage in a warehouse, (3) their transfer

to and treatment in a denaturing plant, and (4) the sale of the denatured product to a permittee.

■ The basic tax must be assessed against and collected from the distiller upon the withdrawal of distilled spirits from storage. Under the Denatured Alcohol Act and Title III of the National Prohibition Act, however, the tax is waived, and the distilled spirits are obtained by the denaturing plant free of the Government's lien. From that moment forward they remain tax-free. A subsequent diversion by a manufacturer does not resurrect the Government's claim which lies solely against the distiller. To quote again from United States v. Bornn, supra, for it "would be quite unreasonable to suppose that taxwise the denatured alcohol was in a state of flux, now free of tax and now taxable, depending on the good faith or bad faith of successive owners."

■ All this may be freely conceded without affecting the relative positions of the plaintiff and the defendants one whit. The instant cause is not a suit for taxes or penalties but is one founded upon an independent contractual obligation. The terms of the defendants' bond and not the provisions of the statute imposing the basic tax are controlling here. In this respect the present case is analogous to United States v. Frost, 5 Cir., 1935, 80 F.2d 341. See United States v. Mack, 1935, 295 U.S. 480, 55 S.Ct. 813, 79 L.Ed. 1559; United States v. United States F. & G. Co., 4 Cir., 1915, 221 F. 27; United States v. Hartford Accident & Indemnity Co., supra; United States v. Sendrow, D.C.N.J.1935, 11 F. Supp. 454; United States v. Bodine, D.C.N.J.1935, 11 F.Supp. 397.

■ Fourth. Since the plaintiff is suing in contract the statute of limitations relating to penalties and taxes do not bar recovery. United States v. United States F. & G. Co., supra, was an action upon a bond. The court said [221 F. 29]: "In the first place, we are of opinion that the action is not barred by any statute of limitations. * * * this suit is brought upon the bond of a surety, and not to recover a statutory penalty or forfeiture, and it seems clear to us that the section quoted [1047 of the Revised Statutes, now 28 U.S.C.A. § 791] has no application." United States v. Frost, supra, United States v. Hartford Accident & Indemnity Co.,

supra, Durning v. McDonnell, 2 Cir., 86 F.2d 91, United States v. Sendrow, supra, and United States v. Bornn, supra, are to the same effect.

■■ Fifth. The repeal of the Eighteenth Amendment to the Constitution did not automatically rescind the entire National Prohibition Act. Title III, among other portions, remained in force. Helvering v. Druggists' Specialties Co., 3 Cir., 1935, 76 F.2d 743. As was said in United States v. Philip H. Warshaw, D.C.N.Y. 1934, 8 F.Supp. 95, 96, the "regulation of industrial alcohol was incorporated in section 13, title 3, of the National Prohibition Act (27 U.S.C.A. § 83), and made enforceable prior to the adoption of the Eighteenth Amendment. * * * A history of the legislation relating to industrial alcohol shows that it was not necessary for a constitutional amendment to have Congress regulate the manufacture of industrial alcohol." What the court had reference to was of course the Denatured Alcohol Act of 1906. This has never ceased to be law. Bilodeau v. United States, 9 Cir., 1926, 14 F.2d 582; United States v. Bornn, supra.

■ But regardless of the effect of the repeal of the Eighteenth Amendment, this is a suit in contract on a bond and not for the enforcement of penalties under the National Prohibition Act. Thompson v. United States, 9 Cir., 1935, 80 F.2d 663. Defendants' sixth defense thus falls of its own weight. United States v. Mack, supra, is quite explicit on this point. That case involved a bond conditioned upon the return to the custody of the Collector of the Port of New York of a vessel which had been seized with a cargo of intoxicating liquors. In course of his opinion Mr. Justice Cardozo said that [295 U.S. 480, 55 S.Ct. 815, 79 L.Ed. 1559]: "Penalties and forfeitures imposed by the National Prohibition Act for offenses committed within the territorial limits of a state fell with the adoption of the Twenty-First Amendment. * * * The courts below have held that liability upon the bond in suit was conditioned by implication upon the possibility in law of subjecting the delinquent vessel to forfeiture and sale, and that the possibility must be unbroken down to the recovery of judgment against the delinquent obligors. In opposition to that holding the government contends that the bond is a contract to be enforced according to its terms; that liability became com-

plete upon the breach of the express condition for the return of the delinquent vessel; and that the liability thus perfected was not extinguished or diminished by the loss of penal sanctions. We think the government is right."

Sixth. The present suit being in the light of this ruling, one in contract, the only question remaining is the measure of damages under the defendants' bond. In construing an identical instrument in United States v. Kern, D.C.E.D.N.Y.1934, 8 F.Supp. 296, Judge Campbell held that it contained two separable conditions, one in general compliance provisions, the other a provision for the payment of $4.50 per wine gallon for all specially denatured alcohol unlawfully diverted, lost or unaccounted for in violation of the permit, the statutes, and the regulations. The first he found to be not a penalty bond but an indemnity bond under which the Government could recover the damage suffered by reason of the loss of the basic tax on the number of gallons diverted. The $4.50 unit rate, however, he declared to be a penalty on the ground that it was in excess of the maximum amount of the tax collectable, which was $4.18 per wine gallon.

The Circuit Court of Appeals for the second Circuit reached a diametrically opposed result in United States · v. Bornn, supra. Among other things it was said that:

"The rate of $4.50 per wine gallon was somewhat in excess of the nonbeverage rate of tax on distilled spirits, but was well below the beverage rate of tax. We are of the opinion that the regulation calling for such a bond was fairly within the power delegated to the Commissioner, and that the situation, was the same as if Congress had itself determined the form of bond to be used. In view of this conclusion, we pass the question whether the bonds would be enforceable if beyond the Commissioner's power * * *.

"It is said that the condition to pay $4.50 per wine gallon for alcohol diverted to unlawful uses is not related to any financial damage suffered by the United States. That may be true, but the efficacy of the condition is not impaired. With a bond of this type running to the government, it is of no moment that the government suffered smaller damage or no damage measurable in money. * * * The bonds,

containing as they do a condition for the payment of a definite sum per gallon of alcohol diverted, are to be distinguished from general compliance bonds of the sort dealt with in United States v. Chouteau, 102 U.S. 603, 26 L.Ed. 246, and in United States v. Zerbey, 271 U.S. 332, 46 S.Ct. 532, 70 L.Ed. 973. Here it was the intention of the parties to dispense with proof. of damages and to fix the specified sum per gallon of diverted alcohol as a definite amount to be paid if the permittee diverted alcohol in fraud of the government. We know of no law which defeats recovery on the agreed basis."

The diversions proved in the Bornn case all accrued during the period in which a basic rate of $2.20 per wine gallon was effective. Those charged here are supposed to have taken place subsequent to the reduction of the basic rate to $1.10 per wine gallon. This is a most vital distinction.

United States v. Dieckerhoff, 1906, 202 U.S. 302, 26 S.Ct. 604, 605, 50 L.Ed.. 1041, is the leading case cited by the Circuit Court of Appeals for the Second Circuit to sustain the validity of the $4.50 unit penal sum. The Supreme Court there construed a bond given as security for the redelivery of certain imported articles in pursuance to sec. 2899 of the Revised Statutes. This stated that no "merchandise liable to be inspected or appraised shall be delivered from the custody of the officers of the customs until the same has been inspected or appraised, or until the packages sent to be inspected or appraised shall be found correctly and fairly invoiced and put up, and so reported to the collector. The collector may, however, at the request of the owner, importer, consignee, or agent, take bonds, with approved security, in double the estimated value of such merchandise, conditioned that it shall be delivered to the order of the collector, at any time within ten days after the package sent to the public stores has been appraised and reported to the collector." The holding was that: "In carrying out this purpose we hold the law permitted the taking of such a bond as was given in this case * * *. We think such undertaking, for this manner of discharging this duty, or paying the value stipulated, was intended to and does relieve the government from the necessity of showing any actual damage or loss. It is suggested that

the government may prove the damages sustained possibly by the testimony of informers or of those who packed the merchandise before shipment, and in other ways. But in our opinion it was the purpose of this statute, and the bond executed in the case, to dispense with the necessity of resort to this method of showing damages, and to fix double the value of the package ordered to be returned, as a definite sum to be paid for the nonfulfilment of the statutory duty. In such cases the recovery is for the stipulated sum, and is not limited to the damages actually proven."

 Neither Title III of the National Prohibition Act nor the Denatured Alcohol Act fixed the penal sum of the bonds required of persons desiring to withdraw alcohol from storage for industrial purposes free of the basic tax. Section 83 of 27 U.S.C.A. simply directed the Commissioner of Internal Revenue to issue such regulations as might "be necessary, advisable, or proper, to secure the revenue," and to effect certain other objectives. This authorization left the form of the security to the discretion circumscribed by the nature and amount of the basic tax.

In United States v. Zerbey, 1926, 271 U.S. 332, 46 S.Ct. 532, 533, 70 L.Ed. 973, the plaintiff prayed judgment on a bond in the penal sum of $100,000, conditioned upon full compliance with all of the laws and regulations of the United States respecting the sale and use of distilled spirits and wines for other than beverage purposes. Mr. Justice Sanford effectively distinguished United States v. Dieckerhoff, supra, saying that the "case now presented is *not* that of a bond executed to the Government in a specified penal sum *prescribed by statute*, and intended as a fixed penalty imposed for a breach of statutory duty, which is forfeited in its full amount by a breach of the condition irrespective of the actual damage thereby caused by the Government." (Italics supplied.) Similarly in United States v. Randall, 2 Cir. 1932, 58 F.2d 193, 194, the court declared that "it is apparent that the decision in the Dieckerhoff Case was based upon the manifest intention of Congress to provide a specific sum as a penalty for failure to return the merchandise as required by the statute. Here section 26, title 2 [of the National Prohibition Act], is silent with respect to what shall be done in the bond in the event of a failure to produce the

vehicle. The provision for the sale of the vehicle and the payment of claims of innocent lienors indicates that Congress intended * * * that such bond as was given here would save the government harmless against loss for the value of the interest of the owner in the seized vehicle."

United States v. Mack, supra, is also pertinent. The court observed that "the bond may not be read by a process of construction as subject to conditions not expressed upon its face. In saying that we have no thought to pass upon the quantum of a recovery thereunder. There are decisions of other courts to the effect that the bond is one of indemnity, so that only the damages actually suffered by the omission to produce the boat for surrender at the appointed time will be owing upon default. * * * We leave those questions."

 Since the $4.50 unit penal sum was not fixed by statute it must be shown to be reasonable and well within the discretion of the Commissioner. As long as the basic tax was $2.20 per proof gallon, the fairness of this rate was not open to dispute. For this reason the holding in the Bornn case must be conceded to be sound. But after the reduction of the basic tax to $1.10 per proof gallon, the $4.50 unit penal sum was in my opinion arbitrary, excessive and beyond the power delegated to the Commissioner. That this fact was recognized by him is demonstrated by his promulgation on August 23, 1927, Article 112 of Regulations No. 3 fixing a new unit penal sum of $2. Many of the bonds providing for the old rate were thereupon cancelled and replaced, ·but it did not follow that those which remained outstanding were abrogated.

 A contract must, if possible, be reasonably interpreted. It is to be treated as having a binding effect unless its language cannot possibly warrant such a construction. The original function of the form 1480 bonds was "to secure the revenue." A mere change in the unit penal sum which had been devised as a means to that end will not defeat their enforcement. To my mind the $4.50 rate provided for should be disregarded, and the instrument herein involved be ruled to be one of indemnity. The Government will accordingly be allowed judgment only for the aggregate amount of the basic taxes which it can ultimately show were lost by reason

of the unlawful diversions of specially denatured alcohol committed by the defendant, Van Schaack Bros. Chemical Works, Inc. Of course in the final analysis, the question of the measure of recovery is purely academic in this suit, for, if the number of wine gallons diverted is as large as that alleged by the plaintiff, the entire penal sum of the bond will be consumed no matter what theory of damages is adopted.

Seventh. The plaintiff's case does not depend to any extent whatsoever upon paragraph 8 of the permit issued December 2, 1929. At the worst it is mere surplusage. Since its retention at this stage can do no harm, those portions of the answer and amendment to the answer controverting its validity and effect will be stricken without prejudice to the right of the defendants to reassert the objections at a later stage of the proceedings.

 Paragraph XI of the answer alleges that, if any diversions of specially denatured alcohol did occur, the defendant, Van Schaack Bros. Chemical Works, Inc., had no corporate knowledge of them "except in so far as the knowledge of (certain of its) minor employees * * * may be considered as such", and "that said defendant did not profit or benefit by reason of any of the acts described in the amended complaint." Neither defense is in my opinion well-founded. It is elementary law that the knowledge of an agent or employee obtained within the sphere of his agency or employment will be imputed to the corporation. The fact that no profits or benefits may have been derived from the alleged misapplications of specially denatured alcohol is wholly irrelevant. Proof that the plaintiff incurred losses of revenue because of the unlawful conduct of the defendant, Van Schaack Bros. Chemical Works, Inc., is sufficient to sustain a recovery under the bond.

 The plaintiff's motion to strike will accordingly be sustained with respect to section 8 of paragraph I and paragraphs II and IX to XIV of the answer. It will be denied in so far as it relates to paragraphs XVI and XVII of the answer. Since a motion to strike, which is in the nature of a demurrer, searches the whole record, the plaintiff is hereby directed to amend its amended complaint in conformity with these findings.