In re MIFFLIN CHEMICAL CORPORA-
TION.

SHERIDAN et al. v. ROTHENSIES,
Collector of Internal Revenue.
No. 7692.

Circuit Court of Appeals, Third Circuit.

Decided Oct. 29, 1941.

Harry Shapiro and Morris M. Wexler, both of Philadelphia, Pa. (Wexler & Weisman, of Philadelphia, Pa., on the brief), for trustees.

John E. Shea, of Washington, D. C., and Gerald A. Gleeson, U. S. Atty., and J. Barton Rettew, Jr., Asst. U. S. Atty., both of Philadelphia, Pa. (Julian R. Eagle, of Philadelphia, Pa., Atty., Bureau of Internal Revenue, on the brief), for appellee.

Before CLARK, JONES, and GOODRICH, Circuit Judges.

GOODRICH, Circuit Judge.

This case presents an appeal from an order of the District Court allowing against the Mifflin Chemical Corporation, a debtor corporation under § 77B, 11 U.S.C.A. § 207, a tax claim in the principal amount of $187,-488 on denatured alcohol diverted to beverage purposes. The claim is for unpaid taxes on such alcohol sold between August 27 and December 30, 1935. The District Court had referred the matter to a special

master who, after a series of meetings, filed a report in which a disallowance of the claim was recommended. The District Judge did not accept this recommendation. The principal arguments of the appellant and the facts relating to them will be dealt with individually.

I. Appellant complains that the lower court erred in allowing the claim for taxes without remanding the case to the master and without giving the trustees for the debtor corporation an opportunity to offer testimony in opposition to said claim. Cases involving disallowances of claims by referees are cited in support of this argument.[1]

There are two answers to the point. The first is that the function of the referee is not the same as that of the special master. The ordinary reference of a case to a referee makes him a court for that purpose.[2] The master functions in an advisory capacity only. The reference in this case is under § 77B of the Bankruptcy Act, prior to the Chandler Act.[3] The order of reference authorized the special master "to make * * * findings of fact and conclusions of law on the issues of insolvency, creditors' claims, * * * and to report thereon to the Court." The special master thus did not sit as a court; it was his function to hear and report his findings of fact and conclusions of law.[4] Nor were his powers increased by the fact that apart from this reference he was a referee.[5]

The argument is likewise inapplicable as a matter of fact, because the trustees were given an opportunity to be heard. But they did not choose to offer testimony. At the conclusion of the hearings the special master stated, and no objection was made, that it was not necessary to act on various motions by both counsel because no further testimony was to be offered by either side and therefore, the case was to be decided on the record already before him. Counsel for the trustees did say that he might want to offer evidence after action of the master on his motion to strike out

1 In re John H. Livingston Co., 2 Cir., 1905, 144 F. 971; In re Crandall, 9 Cir., 1913, 205 F. 689; In re Arthur E. Pratt Co., D.C.N.D.N.Y.1918, 252 F. 917; In re Tenenbaum & Abramowitz, D.C.S. D.N.Y.1931, 56 F.2d 217.

2 In re Williams Supply Co., Inc., 2 Cir., 1935, 77 F.2d 909, certiorari denied, 1935, 296 U.S. 612, 56 S.Ct. 131, 80 L. Ed. 434. Of course his findings are subject to review by the bankruptcy court. § 2, sub. a(10) of the Chandler Act, 11 U. S.C.A. § 11.

3 Subdivision (c) (11) authorized the judge to "refer any matters to a special master, who may be one of the referees in bankruptcy, for consideration and report, * * *." 11 U.S.C.A. 207, sub. c (11).

4 "The chief distinction between reference to a special master and to a referee is in the greater power which the referee ordinarily wields. The orders of the referee are those of the court, whereas the reports of a special master, which are merely advisory, need confirmation by the judge before they are made effective." 2 Collier on Bankruptcy, 14th Ed.1940, 416, 417. The rule is established that the findings of fact made by the special master are to be accepted "unless clearly erroneous". General Bankruptcy Order 47, 11 U.S.C.A. following section 53, and Rule 53(e) (2), Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723(c). But it still lies in the discretion of the court to consider

the master's report and to act thereon. And: "Where * * * the district judge refuses to accept or sets aside the master's findings, such findings are without controlling force in the circuit court of appeals." 2 Collier on Bankruptcy, 14th Ed.1940, 967. See id. at 415, 1505; 3 Moore's Federal Practice, 1938, 3145.

The foregoing is an answer also to appellant's contention that it was error for the District Judge to set aside findings of fact of the special master. But it is not essential that we pass on the propriety of that procedure. Here the District Judge, because of a matter of law, disapproved certain findings of the master. He disagreed with the latter as to the importance of the fact that the debtor corporation might not have had actual knowledge of what its salesmen knew or did. Under such circumstances we need not pass upon the effect to be given to normal findings of fact in a master's report. We need pass merely on the legal question.

5 "Frequently judges may refer to a referee as a special master certain issues in a proceeding that have not already been referred to a referee by a general reference, or certain issues upon which the referee cannot act as a referee. The referee then has only the powers and performs only the duties usually performed by special masters within the scope of the reference, and does not act as a referee." 2 Collier on Bankruptcy, 14th Ed.1940, 418.

certain testimony. But this too was never done despite the fact that in his ruling on that motion, the master again offered an opportunity to the debtor corporation to bring forth witnesses. Further, in response to an order obtained by the government, counsel for the trustees informed the special master that they would not offer any testimony. Nor was any request to do so made until after the case was decided by the District Court adversely to the debtor corporation. We think this mere statement of facts is sufficient to show that there was no denial of the right of the debtor corporation to offer testimony. It chose to refrain from doing so and therefore does not have a right now to obtain another opportunity because of an adverse decision.[6]

■ II. Appellant makes the point that the imposition of the tax lacked basis in fact because of the absence of foundations and certainty with regard to the amount of alcohol which the government claimed was so diverted as to become subject to taxation. This subject, however, was considered at length and with care by the learned judge who had the testimony before him and who reviewed it in his opinion. Where he felt that the proof was not clear he reduced the amount which was claimed against the debtor and that reduction was considerable. The original assessment was for $254,746.80 which the trial judge reduced to $187,488. We cannot say that there was no substantial basis for his finding and the point is governed by the ordinary rule with regard to the findings of fact in the court below.[7]

III. The remaining arguments of the appellant are directed to the application of the taxing statutes and the regulations thereunder to the facts of this case. To their answer a brief resumé of the history of the present legislation is indicated. Originally, denatured alcohol was subject to the same tax as alcohol intended for beverage purposes. In 1873 for the first time Congress provided for an exemption from the tax where alcohol was used for specified scientific purposes.[8] Then in 1894 a rebate of the tax on alcohol to be used for non-beverage purposes was ordered.[9] In 1906 the Denatured Alcohol Act [10] was passed. This authorized alcohol for industrial purposes to be withdrawn from bonded warehouses without payment of the usual tax. The same plan was incorporated in Title III of the National Prohibition Act,[11] which also empowered the Commissioner of Internal Revenue to issue regulations concerning alcohol "to secure the revenue, to prevent diversion of the alcohol to illegal uses * * *." Pursuant to this authorization a regulation was promulgated to the effect that

"The sales of this product must be confined to persons legitimately engaged in a bona fide drug trade, * * *. Failure to comply with these requirements and to confine sales to such persons, or the making of sales to such persons in quantities in excess of their reasonable requirements will constitute bad faith on the part of the permittee and grounds for the revocation of his permit." [12]

■ The taxing act in effect at the time in question was Section 2 of the Liquor Taxing Act of 1934[13] which provided for a unit tax of $2. Coupled with this act, however, and also applicable, is the Act of August 27, 1935.[14]

6 "At first sight, it might appear that the retaking of evidence, or the taking of new evidence, could, justly wrong no one, for the making of more truth to appear would afford greater opportunity for just judgment. But affording chances for retaking testimony after judgment might not always, and probably would not often, tend to the elucidation of truth. Temptations would be furnished which it is the policy of the law to avoid." Witters v. Sowles, C.C.D.Vt.1887, 31 F. 5, 11.

7 See Rule 52(a), Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723(c).

8 Act of February 21, 1873, C. 173, 17 Stat. 468.

9 Act of August 27, 1894, C. 349, § 61, 28 Stat. 509, 567.

10 34 Stat. 217, 26 U.S.C.A.Int.Rev. Code, §§ 3070, 3072, 3073.

11 41 Stat. 319, 27 U.S.C.A. § 71 et seq.

12 Art. 146 of Regulations 3, as amended by Treasury Decision 4541, approved April 17, 1935, Volume 33, Treasury Decisions, Internal Revenue, 90, 93.

13 48 Stat. 313, 26 U.S.C.A.Int.Rev. Code, § 2800(a) (1).

14 49 Stat. 873, 27 U.S.C.A. 153. Section 4 provides:

"Any person who shall produce, withdraw, sell, transport, or use denatured alcohol * * * in violation of laws or regulations now or hereafter in force pertaining thereto, and all such denatured alcohol * * * shall be subject to all provisions of law pertaining to alcohol

It is to be noted that the liability which is the basis of the claim in this case does not arise from any regulation, but from the statute itself. The Act of 1934 sets the unit tax. The 1935 statute provides for payment of the tax if denatured alcohol is withdrawn and distributed in violation of the statute or regulations. The regulations do not impose the tax; they simply provide for the manner in which the tax-free alcohol is to be distributed. Mifflin's contention that alcohol improperly withdrawn is not subject to tax but only subjects a producer or seller to revocation of permit is without foundation.

■ We think that there is no force in the argument either that the amount of alcohol in excess of reasonable requirements cannot be ascertained at all or was not ascertained in this case. The tax sought to be imposed here is for alcohol which found its way into the channels of illicit trade. Illicit distribution is not within the reasonable requirements of anybody's legitimate business.

■ The final question, however, is whether Mifflin is to be charged with responsibility of knowledge of facts concerning such distribution. It is assumed for the purpose of argument, though not decided, that it becomes liable for the tax only if responsibility for knowing of improper diversion may be attributed to it. The District Court pointed out and properly emphasized the very considerable growth in the company's sales of this product during the period in question.[15] This fact alone may not be conclusive but it certainly is one which should suggest an inquiry to the company's management.[16]

And of course, under such circumstances the failure to investigate will not excuse one from the consequences of what an investigation, if made, would have disclosed.

The scheme for the illegal diversion of this alcohol was carried out by salesmen for Mifflin in New York and Philadelphia. There is no dispute that these men had full knowledge of the transactions. Mifflin argues, however, that such knowledge is not to be attributed to it because in carrying out the unlawful plans its agents were acting contrary to the company's interests; therefore, their knowledge is not attributable to the employer. The evidence on this point is somewhat equivocal.[17] But for the purpose of the discussion it may be assumed that the salesmen did not tell their superiors for fear of disapproval of the scheme. Added to that is another piece of evidence to the effect that one of them received a commission or gift from one of the bootleggers for help given.

■ Even then, we believe unquestionably that Mifflin is charged with responsibility for the knowledge of its employees. As Judge Holly puts the legal proposition: "It is elementary law that the knowledge of an agent or employee obtained within the sphere of his agency or employment will be imputed to the corporation."[18] The very job these salesmen were employed to do was to sell alcohol and selling alcohol they were, although in an improper way. Of course they were doing it to make money; the difference between doing it in a proper and an improper way was that doubtless they made more by the latter course. But: "The mere fact that the agent's primary interests are

---

that is not denatured, including those requiring the payment of tax thereon; and the person so producing, withdrawing, selling, transporting, or using the denatured alcohol * * * shall be required to pay such tax."

The purpose of this act, stated by the Senate Committee on the bill, Senate Report No. 1330, dated August 15, 1935, was as follows:

" * * * Denatured alcohol, denatured rum, and articles, if lawfully produced and used are tax free and not subject to many of the restrictions to which other distilled spirits are subject; but in order to prevent frauds upon the revenue it is essential that this tax-free alcohol * * * be subjected to the taxes and other provisions of law relating to alcohol that is not denatured if the Govern-

ment requirements as to production, withdrawal, sale, transportation, or use are not observed."

[15] As against 32,000 gallons monthly in January and February of 1935, Mifflin withdrew 64,000 gallons of denatured alcohol per month from August to December of that year. Further the price per gross rose from $11.25 on September 12 to $13.00 on November 2.

[16] See Morgenthau v. Mifflin Chemical Corp., 3 Cir., 1937, 93 F.2d 82, 86, 88.

[17] See Judge Bard's opinion in the lower court. In re Mifflin Chemical Corp., D.C.E.D.Pa.1940, 34 F.Supp. 164, 169, 173.

[18] United States v. Van Schaack Bros. Chemical Works, Inc., D.C.N.D.Ill.1940, 33 F.Supp. 822, 833.

not coincident with those of the principal does not prevent the latter from being affected by the knowledge of the agent if the agent is acting for the principal's interests." Restatement, Agency § 282, Comment b.

Counsel for Mifflin have cited authorities where courts have held that when an agent departs from his employment and acts adversely to his principal the latter is no longer responsible for facts known to the wrongdoing employee. But in these cases the agent was found either to be actively cheating or defrauding his principal or acting adversely as the other party to the same transaction in which he was serving as his principal's agent.[19]

Zito v. United States, 7 Cir., 1933, 64 F.2d 772 is a case presenting facts not dissimilar in this respect to the case at bar. The knowledge of the agent in that case was sufficient to charge the company with criminal responsibility. In the instant case the question is not that of punishment or penalty, but simply that of the payment of a tax because the conditions on which non-liability was conditioned have not been complied with. One need not talk about actual knowledge by Mifflin or a presumption that the employer knows everything that the employee knows. It has been conceded that these employees were violating instructions and that they concealed from their superiors in the Mifflin organization the knowledge of their activities in promoting illegal diverson of the alcohol. That does not, on principles of agency, ipso facto relieve the employer of liability. Responsibility of an employer for things his agent does is not imposed on the basis of knowledge in fact, but under the general rule of respondeat superior. No reliance need be made on any fictional attributing of knowledge to Mifflin. The employers are responsible for the knowledge of the facts had by their agents in doing the very business for which they were employed. The learned trial judge correctly concluded that the tax was due and payable.

The order of the District Court is affirmed.

---

[19] Schutz v. Jordan, 1891, 141 U.S. 213, 11 S.Ct. 906, 35 L.Ed. 705; Thomson-Houston Electric Co. v. Capitol Electric Co., 6 Cir., 1894, 65 F. 341; Bank of Overton v. Thompson, 8 Cir., 1902, 118 F. 798; Dixie Guano Co. v. Wessel, 4 Cir., 1924, 296 F. 433, 35 A.L.R. 322.

In other cases cited it was found that the agent was not in the scope of his authority. American Surety Co. v. Pauly, 1898, 170 U.S. 133, 18 S.Ct. 552, 42 L. Ed. 977; Hart v. Bier, C.C.E.D.La.1896, 74 F. 592.